Landon, P. J.
The question presented upon this appeal is, whether within the construction which we gave to section 23, chap. 40, Laws of 1848, upon the former appeal in this case (36 Hun, 622, 37 id., 341)the defendants Eobinson & Pinkham or either of them, consented to any of the indebtedness of the Schaghticoke Woolen Mills to the Merchants and Mechanics’ Bank of Troy, contracted by the company to the bank at any time after the indebtedness of the company exceeded the amount of its capital stock.
Upon the former appeal, we held that the liability of the defendants as trustees for the indebtedness of the company to the bank, assented to by the defendants when they knew that the existing indebtedness of the company was already in excess of the amount of its capital stock, was in the nature of a contract liability and attached to each item of indebtedness the instant it was created, and was not discharged by reducing the aggregate of the company’s in • debtedness, but could only be discharged by payment or satisfaction.
The capital stock of the Woolen Mills Company was $250,000. Its indebtedness to the bank May 1, 1875, was $300,776. Its indebtedness to its other creditors was be-between $135,000 and $140,000. Its excess of indebtedness over its capital stock was at that date over $185,000.
D. Thomas Vail was a trustee of both bank and woolen company, and the president and leading manager of both corporations. The defendant Eobinson was a stockholder in both corporations, and a trustee of the woolen company. He, however, as was held upon the former appeal upon evidence which in this respect is unchanged, had not assented to the creation of the indebtedness of the company in excess of its capital stock, existing May 1, 1875. On that day he was fully advised of it, and as the desperate situation threatened the existence of both company and. *349 bank, he and Vail entered into a verbal agreement which the referee states as follows :
9. That on the 1st day of May, 1875, D. Thomas Vail, acting in this regard both in behalf of the said woolen mills and of the said bank, entered into an agreement with the defendant Robinson to the following effect:
That the debt of the Schaghticoke Woolen Mills, then due to the Merchants and Mechanics’ Bank of Troy should be treated as dead or suspended debt; that said Vail, as president of the woolen company, should make drafts on the treasurer of the said company, which after acceptance by him should be indorsed byVail & Robinson individually; that they should also individually guarantee other paper of the said company when advisable, which paper so indorsed and guaranteed -should be used in the purchase of wool for the mills in manufacturing cloth; that such wool and the cloth manufactured therefrom should be the property of Vail and Robinson until the cloth was disposed of and that the proceeds thereof should be applied to the payment of the supplies, labor and current expenses of the mills and of the paper so indorsed and guaranteed, and no part of such proceeds were to be applied to the payment of the old or suspended debt held by the bank until all outstanding claims for such paper, supplies, labor and current expenses were satisfied.
Relying upon this agreement, Robinson consented to and aided in the operation of the woolen company from May 1, 1875, until about the 31st day of October, 1878, upon which day, at noon, the bank suspended business, and its assets were on the 27th of November following, placed in the hands of plaintiff as receiver.
The receiver found among the assets of the bank one hundred and thirty-nine drafts and acceptances of the woolen mills company to the amount of $419,361, the date of the earliest being June 5, 1875, and of the latest May 1, 1878.
These drafts and acceptances were apparently past due and unpaid. Robinson had indorsed many of them, and had assented to the creation of every one of them. Pink-ham had assented to the creation of a portion of them.
After May'l, 1875, all the earnings and proceeds of the woolen mills were deposited in the bank and all the payments and disbursements of the company were made through the bank. Stated in round numbers and by way of illustration, the disbursements of the company for materials were about $200,000 per year, for wages and expenses about $60,000. The paper of the company in the form of time drafts upon the company, was usually given for supplies.
The pay-roll and other expenses were paid by checks *350 on the bank. The paper for supplies came to the bank through its exchanges with other banks. The bank always took up this paper out of its general funds. From May 1, 1875, to November 1, 1878, the company deposited with the bank more than money enough to pay all these drafts and checks, that is, all the paper upon which this action is founded, and all checks drawn for wages, expenses and every other expenditure of the company after May 1, 1875, exclusive of the old debt and the interest thereon.
. But in keeping its books, the bank from time to time, as it made payments upon account of the company, did not apply such payments upon the drafts which it received through its exchanges, but applied them upon the old paper of the company, ana the interest thereon in the order of its age, and kept the new paper unprotested as unpaid interest bearing paper.
The bank in like manner paid some of the old debts of the company due to other creditors. The result was that on the 1st day of November, 1878, the books of the bank showed that the old debt of the company was entirely paid, and that the entire indebtedness of the company to it was upon the new paper, to the creation of which paper, Robinson had assented to all and Pinkham to part.
The referee found that the defendants Robinson and Pinkham had not assented to this application of the company’s funds or credits by the bank, and had not assented to' or ratified the advance by the bank of its own funds to procure the new paper of the company, and held that Robinson was not liable, first, because as between him and the bank the new paper was paid, second, because he did not conset that the company should create any debt to the bank by its advances to take up the new paper. He held Pink-ham not liable upon the second of these grounds.
Another fact should be stated. Prior to June 1, 1878, the woolen company had made considerable money, and a considerable surplus of earnings had been deposited over and above what was necessary up to that date, to pay the new paper and current expenses of the company, and :such old-outside debts of the company as the bank had retired out of the company’s credits in the bank. The application by the bank of the company’s credits to the old debts so far exhausted these credits that between June 1, 1878 and November 1, 1878, the advances by the bank for the woolen company in its usual course of business increased the debt of the company to the bank between those dates in the sum of $18,653.
There does not appear to be much dispute about the facts; the appellant contends that the inferences and conclusions of the referee are unwarranted.
*351 Robinson was not liable for any of the company’s debts created prior to May 1, 1875. As the affairs of the company and bank then stood,, the suspension of the company would have caused the suspension of the bank. Both Robinson and Vail desired to prevent these results. Robinson proposed to lend his credit and supervision to the business of the company, if both bank and company would protect him in the manner proposed. The proposition was accepted, and for three years and a half Robinson lent his credit to the company upon every new debt which it created amounting to about $200,000 per year. If the agreement with Vail had been carried out, Robinson would have been fully protected. Not a dollar of debt was created for which the mills did not provide the dollar to pay it. For the bank to divert the money thus provided to pay the new debt, and leave it unpaid, was a fraud upon Robmson. It is unreasonable to suppose that he assented to it, and his testimony is explicit that he did not, and Vail’s testimony tends to corroborate him.
But it is urged that Vail had no power to make the agreement with Robinson so as to bind the bank. It is not questioned that Vail had ample power to bind the bank unless his two-fold relation to bank and company, and his personal interest neutralized his power. While the agreement remained an executory one, it is probable these' objections would suffice to defeat its performance if urged by the bank. But in good faith it was fully executed upon the part of Robinson, and the bank has liad the benefit of it. It stands now as a fact accomplished, which brought during three and one-half years about $925,000 of the company’s deposits to its general funds. It could not have received those deposits, except for its contract with Robinson. Plainly, as between the bank and Robinson, the bank was bound to receive these funds upon the contract made with him, or repudiate its president’s assumption of authority, and notify Robinson at the earliest opportunity.
Vail, in the agreement with Robinson, assumed to bind the bank. It was one of the conditions of Robinson’s performance that the bank should treat its old debt against the company as dead or suspended, and that it should not pay over its counter to the charge of the company’s deposits, the old paper of the company presented there by others. It was competent for the bank to make such an agreement, it could only act through its agent, and Vail was such agent, and made such agreement.
In view of the judgment between this plaintiff and Vail and Robinson acquitting them of the charge of conspiring to defraud the bank, no fraud is imputable to Robinson.
Whether Vail did his full duty to the bank, without pre *352 judice from his private interests, is a" question between him and the bank. The bank knew his official relations to the woolen company, and hoped to benefit by them. There is no legal or moral ground upon which the bank can escape its obligation to Robinson to apply the company’s funds according to the terms upon which it received them.
It is true that Robinson became personally liable upon every draft or acceptance which the company issued in the purchase of supplies to the person to whom it was issued. So long as that paper was held by the creditor, Robinson was his debtor. That paper was payable either in terms or by the known course of business at this bank. When it was presented there it was the duty of the bank as between it and Robinson to pay it if the company was in credit in its deposits, or if under the agreement between it and Robinson it ought to have been in credit.
Although the company was represented in the agreement by Vail and was bound by the agreement, still it was not the object of the agreement to release the company from its old debt to the bank, nor in any way to favor the company with respect to that debt, except in so far as it would be necessary to do so for the protection of Robinson and Vail in their new effort to extricate both the company and bank from their embarrassments. The company’s liability to the bank was to remain; the interest rate and charge to remain.
It would be immaterial to Robinson how the bank kept its books with the company, so long as it kept them with respect to him, so as to observe and comply with the agreement between him and the bank. Thus it is conceivable that it would have been competent for the bank to have kept two sets of accounts with the company, one to show the entire debt account, old and new, and the other an account as to Robinson, in which the old debts of the company should have no place, except as a surplus should be ascertained, properly applicable thereto.
However the books were kept between bank and company, Robinson was entitled to the protection by the bank from his liability upon the new debts of the company to the extent that the new deposits of the company in the new order of business, that is unprejudiced by the old debts, .could protect him. That obligation of protection due him from the bank defeats the bank’s attempt in this action to deny him protection,
If the debt of the company to the bank, is to be regarded as created by the advances of the bank upon the implied request of the company, it would be unjust upon the grands above stated to hold that Robinson assented to the creation of such a debt.
*353 If the foregoing views are correct, then Robinson was not bound by the application of the company’s deposits upon the old debts. We may concede that such application was proper as between bank and company, but as between Robinson and the bank, the application could only be made in conformity with the special agreement. It could not be made so as to prejudice Robinson in the absence of his consent to the application.
There is no difficulty in this double relation of the bank to the company and to Robinson. The company’s new paper all comes to the hands of the bank, in the agreed course of business, and it is easy for the bank to carry out its agreement with him, and protect him. It may be doubted whether any application was ever made by the bank of the new money upon the old debts as between the bank and Robinson, but solely between the bank and company, thus leaving the application now to be made upon equitable principles. These principles require that Robinson shall not be prejudiced.
The agreement, according to Robinson’s testimony, which the appellant relies upon was—6 ‘ under that arrangement the wool and material was to be considered as belonging to him (Vail) and me, and be our property until converted into cloth, and then the cloth was to be sold, and the debts we endorsed, and the material was to be paid up first, and if anything was left, it was to be applied on the debt.” “If anything was left”—the bank was not at liberty to make any application upon the old debt so long as there were any outstanding liabilities, “ for the debts we endorsed and the material.” According to the bank’s theory, there were always such outstanding liabilities, for, instead of paying them, it paid the money applicable to them first upon the old debts, and then upon the oldest of these until these outstanding liabilities amounted to the one hundred and thirty- nine drafts and acceptances, some endorsed by Robinson and others given for material, upon which this action is founded. But we put aside such a theory as inapplicable, and consider that the bank did make such application, as it rightly might. The work of the mill seems to have been divisible by yearly seasons, dependent largely upon the price, year by year, of the yearly crop of wool. If at the close of any year’s business the outstanding year’s liabilities were actually closed, and a surplus was ascertainable before new liabilities had been incurred, the surplus was applicable to the old debts.
The same would be true with respect to any other period, when the liabilities were all discharged, meaning when they might have been, if the agreement with Robinson had *354 actually been respected. Did any such period exist ? If so, could any larger sum have been applied upon the old debts than the aggregate account at the end of the entire business shows to be now applicable ? Upon this question the affirmative rests upon the plaintiff, and he has not enabled the referee or this court to answer it in his favor
We concur in the conclusion of the referee that Robinson is not liable under the statute.
With respect to the defendant Pinkham, the referee holds that he is not entitled to avail himself of the agreement between the bank and Robinson, because he had no knowledge of it, and was not influenced by it. Stated plainly, Pinkham engaged in the business as director, with full knowledge that the indebtedness of the company greatly exceeded its capital stock, but without appreciation of his statutory liability, and with entire indifference to the question whether the moneys of the company were applied upon the old debts or the new. He doubtless thought that, the current receipts of the mills were applied in payment of its current supplies and expenses. Since he did not know that the bank was retiring the old debt and substituting the new in its place, he cannot be said to have assented to the substitution. Since he did not know that the method of doing business between the company and bank required the bank to advance, out of its own funds, upon the company’s new debts, as much as it acquired upon the payment of the old ones, he cannot be said to have assented to the advances.
But he was liable upon each new debt to each new creditor of the company, and if the bank, by cashing these bills as they came to its counter, bought them, then Pinkham is liable to the bank. If it paid them by its advances, then Pinkham is not liable. In order to buy them, there must be both buyer and seller. Lancey v. Clark, 64 N. Y., 209.
The bills were payable at- the bank, either in terms or by the known course of business, and, when they were presented there, it was that they might be there paid. It does not appear that any creditor of the company ever sold one of these bills to the bank. The bank advanced the money ■upon them solely in honor of the company’s written obligation to pay them at its counter.
We conclude that Pinkham is not liable.
Judgment affirmed, with costs.
Fish and Parker, JJ., concur.